UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LEONARD STEVENSON,                    :

       Plaintiff,                    :

       vs.                              :                    No.  3:14cv965(WIG)

CAROLYN COLVIN,                       :
Acting Commissioner of
Social Security,                       :

       Defendant.                    :
----------------------------------------------------X

## RECOMMENDED RULING ON PENDING MOTIONS

Plaintiff Leonard Stevenson has filed this appeal of the adverse decision of the Commissioner of Social Security denying his applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI").  Plaintiff now moves, pursuant to 42 U.S.C. § 405(g), for an order reversing this decision or, in the alternative, for an order remanding the case for a rehearing.  [Doc. # 16].  Defendant has responded with a motion to affirm the decision of the Commissioner.  [Doc. # 19].  For the reasons set forth below, the Court recommends that Plaintiff's motion should be granted in part, and the matter remanded to the ALJ for further proceedings.

## Procedural History

Plaintiff filed his DIB and SSI applications on August 3, 2011, alleging disability as of December 7, 2010.[1] The applications were denied initially and upon reconsideration.  Plaintiff filed a request for hearing on December 3, 2011.  Plaintiff's claims were assigned to the New

---

[1] Plaintiff later amended the onset date to August 9, 2011.  (R. 9).

Haven Office of Disability Adjudication and Review.  On September 26, 2012, a hearing was held before Administrative Law Judge Ronald J. Thomas (the "ALJ").  The ALJ issued a decision on October 26, 2012 concluding that Plaintiff had not been disabled from the amended onset date through the date of the ALJ's decision.  Plaintiff filed a request for review of the ALJ's decision; the Appeals Council denied review, making the ALJ's decision final for appeals purposes.  This appeal ensued.

## Factual Background

Plaintiff was fifty-five years old as of the amended onset date of August 9, 2011.  He is married and has two adult children.  (R. 26-27).  He completed up through the eleventh grade in school.  (R. 27).  Plaintiff last worked in 2010 as a machine operator.  (R. 28).  He stopped working at this job when the company went out of business.  (*Id.*).  Plaintiff also has prior work experience as a telemarketer and a meat packer.  (*Id.*).

## Medical Evidence

Plaintiff presented to the Hospital of Saint Raphael's ("HSR") emergency department on January 15, 2011, complaining of an injury to his left little finger, with pain and swelling lasting for a month.  (R. 204).  The injury occurred six weeks ago when Plaintiff was riding on a city bus that was rear-ended and he put his hand out to brace himself.  (R. 206).  Plaintiff was experiencing mild pain.  (*Id.*).  He appeared in no acute distress.  (R. 204).  An x-ray showed no facture, dislocation, or other significant abnormality.  (R. 208).  The treating physician's clinical impression was arthritis involving the left hand, with possible acute gout.  (*Id.*).  Plaintiff was discharged that day with instructions to follow up if needed.  (*Id.*).

On April 9, 2011, Plaintiff returned to HSR complaining again of the injury to his left little finger.  (R. 225).  Soft tissue tenderness and swelling at the PIP joint was observed.  (*Id.*).

There was no limitation in movement.  (*Id.*).  An x-ray of left fifth little finger taken on that day was unremarkable.  (R. 203).

Plaintiff saw Dr. Schreiber on April 26, 2011 for injuries stemming from the December 2010 bus accident.  (R. 237).  He complained of pain in both wrists radiating to his hands, and of back pain.  (*Id.*).  Plaintiff was assessed with low back pain and wrist pain, was prescribed Tylenol for two weeks, and was referred to an orthopedic.  (R. 238).

On June 2, 2011, Plaintiff sought treatment with Dr. Katz.  Notes indicate that Plaintiff's left hand had obvious boutonniere deformity of the fifth finger with inability to fully flex the fingers secondary to pain and swelling passively.  (R. 241).  In addition, the lumbosacral spine had muscle spasm and tenderness in the lower lumbar region.  (*Id.*).  Plaintiff's forward flexion to extension was sixty to twenty degrees, with discomfort beyond.  (*Id.*).  The neurological exam to the lower extremities was intact.  (*Id.*).  Dr. Katz diagnosed boutonniere deformity of the fifth finger on the left hand and acute musculololigamentous strain to the lumbosacral spine.  (*Id.*).  The plan was to refer Plaintiff to a hand surgeon for consultation as to possible surgery or splinting, to refer Plaintiff to Dr. Cianciolo for therapy to the lower back, to prescribe Flexeril[2] 5 mg, and to use home exercises for lumbosacral stretching.  (*Id.*).

Plaintiff returned to Dr. Katz on July 12, 2011.  Notes from that date indicate Plaintiff had persistent pain in his left hand and ongoing pain in low back region.  (R. 240).  It was noted that Plaintiff's back was doing somewhat better with treatment from Dr. Cianciolo.  (*Id.*).  The fifth finger of the left hand revealed a boutonniere deformity with pain on flexion, and with loss of full extension.  (*Id.*).  There was decreased muscle spasm and tenderness in the lower back,

---

[2] Flexeril is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other injuries.
*See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

with increasing functional range of motion.  (*Id.*).  The plan was to continue treatment with Dr. Cianciolo, do home exercises for lumbosacral stretching, and obtain suggested home exercises for the finger.  (*Id.*).  Dr. Katz recommended that if Plaintiff was still symptomatic, he should have a hand surgery consultation with probable surgical intervention thereafter.  (*Id.*).

On August 8, 2011, Dr. Katz observed Plaintiff's persistent low back pain with activities such as bending and lifting.  (R. 240).  Treatment notes state that Plaintiff had seen Dr. Gross and was given a splint for the boutonniere deformity on his left fifth finger.  (*Id.*).  Upon exam, the left fifth finger revealed less of the boutonniere deformity, but there was still moderate loss of full flexion and extension secondary to deformity.  (*Id.*).  In addition, the lumbosacral spine revealed persistent muscle spasm and tenderness; forward flexion to extension was seventy-five to twenty degrees with discomfort beyond.  (*Id.*).  Dr. Katz believed the boutonniere deformity was likely permanent and would interfere with certain functional activities such as grasping objects and gripping a hammer.  (*Id.*).  Plaintiff was advised to continue home exercises for his back on a daily basis and to intermittently use heat and Advil for acute flare-ups.  (*Id.*).

Plaintiff underwent physical therapy with HSR Outpatient Rehabilitation Services in April and May 2011 for his left fifth finger.  (R. 243).  He stopped therapy on May 12, 2011 after he removed and lost his finger splint.  (R. 251).  Treatment notes state that Plaintiff will see a specialist the next week to determine if further treatment is advisable.  (*Id.*).  In all, Plaintiff attended a total of six physical therapy sessions.  (*Id.*).

Plaintiff also went to HSR Outpatient Rehabilitation Services for physical therapy for his back.  He attended six sessions in April 2011.  (R. 258).  The discharge summary reports that Plaintiff was, after the six sessions, able to bend forward to the shoes.  (R. 264).

4

Dr. Umashanker, from the HSR clinic, saw Plaintiff on October 26, 2011.  Plaintiff reported bilateral lower back pain aggravated by standing or by standing for too long, with no alleviation with sitting.  (R. 270).  Plaintiff was taking no medication at that time.  (*Id.*).  A straight leg test was normal.  (*Id.*).  NSAIDS and Flexeril were prescribed for treatment, with Plaintiff to follow up in six weeks.  (*Id.*).

Plaintiff saw Dr. Umashanker again on February 28, 2012.  On that date, Plaintiff had no complaints but needed to complete paperwork for disability.  (R. 289).  The plan was to do an MRI, continue Flexeril as needed, and return in three months.  (*Id.*).

Dr. Katz's notes from March 13, 2012 state that he assigned a 5% permanent partial impairment to Plaintiff's left hand and a 5% permanent partial impairment to Plaintiff's lumbosacral spine.  (R. 283).  The words "See letter" were typed above the permanent partial disability assessment.  (*Id.*).  No letter was included in the administrative record.

Dr. Umashanker's progress note from April 10, 2012 stated that Plaintiff came for a follow up visit relating to chronic back pain without sensory deficits.  (R. 288).  While an MRI report is not included in the record, she noted that an MRI of the lumbar spine showed superimposed upon mild disc bulge in a right subarticular foraminal disc protrusion which may be contacting R L-4 and L-5.  (*Id.*).  She further noted mild disc desiccation and disc bulging at L-1- L-2 and L-2 -L-3.  (*Id.*).  The plan was to do an orthopedic referral, start NSAIDS for pain relief, and follow up in three months.  (*Id.*).

Finally, in a progress note from July 16, 2012, Dr. Umashanker noted that Plaintiff came for a follow up visit for chronic back pain.  (R. 312).  There was tenderness in lower back; a straight leg test was negative.  (*Id.*).  Plaintiff was informed that he should cease smoking, as it

may be contributing to his back pain.  (*Id.*).  Lower back pain exercises were recommended.
(*Id.*).

## Opinion Evidence

Dr. Kaplan reviewed Plaintiff's claims at the initial level.  On September 2, 2011, he
opined that Plaintiff's condition was currently severe but was expected to improve and would no
longer prevent Plaintiff from doing past work as a meat cutter.  (R. 43).  Because Plaintiff's
condition was not expected to last for twelve consecutive months, a finding of not disabled was
appropriate.  (*Id.*).

At the reconsideration level, Dr. Golkar opined that the severity of Plaintiff's condition
would not last.  (R. 50).  He reported that while Plaintiff would not be able to perform past work,
he would be able to perform less demanding jobs.  (*Id.*).  Dr. Golkar completed a Residual
Functional Capacity ("RFC") assessment considering Plaintiff's back and finger impairments.
(R. 47).  He rated Plaintiff's exertional limitations as follows: Plaintiff could occasionally
lift/carry 50 pounds; could frequently lift/carry 25 pounds; and could stand/walk and sit for six
hours in an eight hour workday.  (*Id.*).  He rated Plaintiff's postural limitations as follows:
Plaintiff could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; he could
occasionally climb ladders/ropes/scaffolds.  (R. 48).  Dr. Golkar additionally rated Plaintiff's
manipulative limitations: frequent fingering and manual work with the left hand were restricted.
(*Id.*).  As a result of the RFC assessment, Dr. Golkar opined that Plaintiff was capable of medium
level work.  (R. 49).  Medical Consultant Dr. Faigel reviewed Dr. Golkar's RFC assessment and
was in agreement with it.  (R. 273).

Dr. Umashanker, who Plaintiff was seeing for his back pain, completed an RFC
Questionnaire on November 18, 2011.  At that time she had seen Plaintiff for one forty-five

minute appointment.  (R. 275).  She opined that Plaintiff would need to rest or lie down during

an eight hour workday in excess of typical breaks.  (*Id.*).  Plaintiff could walk for three to four

blocks.  (*Id.*).  He could sit for five minutes at a time and stand/walk for ten minutes at a time.  In

a workday, Plaintiff could sit for a total of two hours and stand/walk for a total of one.  (*Id.*).

Plaintiff required a job which permits shifting of position for sitting, standing, or walking.  (*Id.*).

He would need to take three to four unscheduled twenty-minute breaks per workday.  (*Id.*).  He

could frequently lift and carry up to twenty pounds, but could never lift fifty pounds.  (R. 276).

Dr. Umashanker opined that Plaintiff had limitations in doing repetitive reaching, handling, or

fingering.  (*Id.*).  She estimated that Plaintiff would likely miss three to four days of work per

month because of his impairments.  (*Id.*).  She added that, upon physical exam, Plaintiff had

muscle tension that can cause back pain, but not to the extent Plaintiff describes.  (*Id.*).

On March 2, 2012, Dr. Umashanker completed a second RFC Questionnaire.  At that

time, she had seen Plaintiff twice.  (R. 279).  She diagnosed him with muscle spasm and

identified his prognosis as good.  (*Id.*).  She opined that Plaintiff's symptoms would frequently

interfere with the attention and concentration required to perform work.  (*Id.*).  She opined that

Plaintiff would need to rest or lie down during an eight hour workday in excess of typical breaks.

(*Id.*).  Plaintiff could walk for two blocks.  (*Id.*).  He could sit for thirty minutes at a time and

stand/walk for twenty minutes at a time.  In a workday, Plaintiff could sit for a total of three

hours and stand/walk for a total of two.  (*Id.*).  Plaintiff required a job which permits shifting of

position for sitting, standing, or walking.  (*Id.*).  He would need to take four to five unscheduled

ten to fifteen minute breaks per workday.  (*Id.*).  He could frequently lift and carry up to twenty

pounds, but could never lift fifty pounds.  (R. 280).  Dr. Umashanker opined that Plaintiff had no

limitations in doing repetitive reaching, handling, or fingering.  (*Id.*).  She estimated that Plaintiff

would likely miss one or two days of work per month because of his impairments.  (*Id.*).  In her

opinion, his impairments were reasonably consistent with the symptoms and limitations assessed

in the RFC.  (*Id.*).

Finally, Dr. Umashanker completed a third RFC Questionnaire on October 18, 2012.  She

diagnosed Plaintiff with chronic back pain and gave him a good prognosis.  (R. 309).  She opined

that Plaintiff's symptoms would frequently interfere with the attention and concentration

required to perform work.  (*Id.*).  In her view, Plaintiff would need to rest or lie down during an

eight hour workday in excess of typical breaks.  (*Id.*).  Plaintiff could walk for two blocks.  (*Id.*).

He could sit for thirty minutes at a time and stand/walk for fifteen minutes at a time.  In a

workday, Plaintiff could sit for a total of one hour and stand/walk for a total of one.  (*Id.*).

Plaintiff required a job which permits shifting of position for sitting, standing, or walking.  (*Id.*).

He would need to take four five-minute breaks each hour.  (*Id.*).  He could frequently lift and

carry up to twenty pounds, but could never lift fifty pounds.  (R. 310).  Dr. Umashanker opined

that Plaintiff had no limitations in doing repetitive reaching, handling, or fingering.  (*Id.*).  She

estimated that Plaintiff would likely miss three or four days of work per month because of his

impairments.  (*Id.*).  She added that "clinical exam, radiological exam is not equivocal to

[Plaintiff's] complaints."  (*Id.*).  Finally, Dr. Umashanker opined that Plaintiff was not physically

capable of working full time on a sustained basis.  (*Id.*).

## Evidence before the ALJ

At the hearing Plaintiff testified that he was in a bus accident in 2010, and his back pain

came about as a result of the accident.  (R. 28-29).  He went to the emergency room several days

later, where he was given medication and had x-rays taken, but has not had any overnight stays

in the hospital since.  (R. 29).  Plaintiff has back pain every day, for about an hour or two.  (R.

29-30).  Medication eases the pain for a while, but then the pain returns.  (R. 30).  He uses a cane and a back brace for support.  (*Id.*).  Plaintiff testified that he can lift about eight or nine pounds and can walk for two blocks.  (*Id.*).  He cannot bend over due to back pain.  (R. 34).

Plaintiff also has problems with his arms and hands that his doctor says are a result of arthritis.  (R. 30-31).  Plaintiff can write holding a pen or pencil, but his hand cramps if he holds the instrument for too long.  (R. 31).  He is able to button a shirt.  (*Id.*).  Plaintiff went to physical therapy for his impairments, and testified that it both did and did not help.  (R. 33).  Plaintiff takes ibuprofen and Cyclobenzaprine daily as needed.  (R. 31).   His medications cause some drowsiness.  (R. 33).

With respect to daily activities, Plaintiff testified that his wife cooks, cleans, does laundry, and grocery shops for him.  (R. 32).  He spends time reading and watching television. (*Id.*).  Plaintiff does have grandchildren, but testified that he does not do anything with them. (*Id.*).  He does not go outside and does not participate in any hobbies or activities.  (*Id.*).  He is not able to do things during the day.  (R. 31).  Once in a while Plaintiff and his wife go out to eat at a restaurant.  (R. 32-33).

### The ALJ's Decision

The ALJ applied the established five-step, sequential evaluation test for determining whether a claimant is disabled.  Step one determines whether the claimant is engaged in "substantial gainful activity."  If he is, disability benefits are denied.  20 C.F.R. §§ 404.1520(b), 416.920(b) (2010).  Here, the ALJ determined that Plaintiff did not engage in substantial gainful activity since the amended onset date.  (R. 11).

At step two, the ALJ evaluates whether the claimant has a medically severe impairment or combination of impairments.  In this case, the ALJ determined that Plaintiff has the following

9

severe impairments: boutonniere deformity of the fifth finger on the left dominant hand and lumbosacral strain.  (R. 11).

At the third step, the ALJ evaluates the claimant's impairments against the list of those impairments that the Social Security Administration acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Part 404, Subpart P, App. 1 (2010) ("the Listings").  If the impairments meet or medically equal one of the Listings, the claimant is conclusively presumed to be disabled.  In this case, the ALJ considered Plaintiff's impairments, alone and in combination, and concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings.  (R. 11-12).

At step four, the ALJ must first assess the claimant's residual functional capacity ("RFC") and then determine whether the claimant can perform past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Here, after considering the record as a whole, the ALJ found that Plaintiff has the RFC to perform medium work except that he is limited to only occasional bending, stooping, twisting, squatting, kneeling, crawling, climbing, and balancing, and is unable to perform frequent fingering and fine manual work activity with his left hand.  (R. 12-16).  The ALJ then determined that Plaintiff was unable to perform his past relevant work.  (R. 17).

Finally, at step five, the ALJ must determine, considering the claimant's age, education, work experience, and RFC, whether there are jobs existing in significant numbers in the national economy claimant can perform.  20 C.F.R. §§ 404.1569, 416.969.  In this case, the ALJ used the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App. 2, to conclude that Plaintiff could perform unskilled medium work, and the additional limitations in the RFC have little or no

effect on this occupational base.  (R. 17).  As such, the ALJ determined that Plaintiff had not

been under a disability from the onset date through the date of the decision.  (*Id.*).

## Standard of Review

Under 42 U.S.C. § 405(g), the district court may "enter, upon the pleadings and transcript

of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing."  Judicial review of the

Commissioner's decision is limited.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  It is not

the Court's function to determine de novo whether the claimant was disabled.  *See Schaal v.

Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, the Court must review the record to determine

first whether the correct legal standard was applied and then whether the record contains

substantial evidence to support the decision of the Commissioner.  42 U.S.C. § 405(g) ("The

findings of the Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive..."); *see Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998);

*Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

When determining whether the Commissioner's decision is supported by substantial

evidence, the Court must consider the entire record, examining the evidence from both sides.

*Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  Substantial evidence need not compel the

Commissioner's decision; rather substantial evidence need only be that evidence that "a

reasonable mind might accept as adequate to support [the] conclusion" being challenged.  *Veino

v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations omitted).

"Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal

quotation marks and citation omitted).

### Discussion

Plaintiff raises several arguments in support of his motion.

    a) The ALJ failed to develop the administrative record.

    b) The ALJ did not follow the treating physician rule.

    c) Substantial evidence does not support the ALJ's credibility determination.

    d) The RFC assessment is not supported by substantial evidence.

    e) The ALJ's step five finding is unsupported.

#### a. Development of the Administrative Record

Plaintiff first argues that the ALJ failed to adequately develop the administrative record

by not seeking out an MRI from 2012, records from the Cornell Scott Hill Center, records from

Dr. Gross, records from Dr. Cianciolo, and the letter referenced by Dr. Katz in his March 13,

2012 notes. Plaintiff contends that these missing reports represent obvious gaps in the record

relating to matters of importance to the outcome of the case. The Commissioner avers that it was

Plaintiff's duty to furnish the ALJ with evidence of his disability.[3]

The ALJ and the claimant share obligations in compiling the administrative record. It is

the claimant's burden to produce evidence. *See* 20 C.F.R. §§ 404.1512(a); 416.912(a). The ALJ

must affirmatively develop the record, even when a claimant is represented by counsel, because a

benefits proceeding is essentially non-adversarial. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.

2009). "When an unsuccessful claimant files a civil action on the ground of inadequate

---

[3] The Commissioner also argues that, effective April 20, 2015, she revised her regulations to require claimants to inform the agency about and to submit all evidence relating to the disability claim. This point is specious, as even the Commissioner points out that such regulation was not in effect at the time of Plaintiff's hearing.

development of the record, the issue is whether the missing evidence is significant." *Santiago v. Astrue*, No. 3:10-CV-937 CFD, 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) (citing *Pratts v. Chater,* 94 F.3d 34, 37- 38 (2d Cir.1996)).   Plaintiff "must show that he was harmed by the alleged inadequacy of the record." *Id.* (citing *Shinseki v. Sanders,* 129 S.Ct. 1696, 1706 (2009)).

The Commissioner correctly points out that while the ALJ "has an affirmative duty to develop the administrative record even when a claimant is represented by counsel, where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Lowry v. Astrue*, 474 F. App.x 801, 804 (2d Cir. 2012) (internal citation and quotation marks omitted).  Here, though, there are obvious gaps in the administrative record.  Dr. Katz refers to Plaintiff's treatment with Dr. Ciancerolo on several occasions.  *See* R. 240, 241.  Dr. Katz also reports that Plaintiff was given a finger splint by Dr. Gross.  *See* R. 240.  The physical therapy records from HSR Outpatient Rehabilitation Services affirm that Plaintiff had been wearing a splint and was doing exercises incorporating the splint. *See* R. 244, 246-248, 251.  In addition, Dr. Umashanker's records state that she planned on referring Plaintiff for an MRI.  *See* R. 289.  Her records also indicate that an MRI was in fact done, as she reports on it in her April 10, 2012 progress note.  *See* R. 288.  Dr. Umashanker planned to refer Plaintiff to an orthopedic at that time.  (*Id.*).

The missing records are significant.  The ALJ found both Plaintiff's boutonniere deformity and his lumbosacral strain to be severe impairments, and then states that "[w]hile claimant's physical impairments do limit his overall level of functioning, the objective medical evidence fails to establish these impairments are disabling." (R. 15).  The missing records are

directly relevant to the impairments the ALJ found to be severe but not disabling.  And, the records that the ALJ did consider clearly indicate that additional relevant materials were in existence.  "There are suggestions in the record that this additional information, if available, would have been helpful to the ALJ's determination."  *Parker v. Colvin*, No. 3:13-cv-1398 (CSH), 2015 WL 928299, at *12 (D. Conn. Mar. 4, 2015) (holding that, when the record repeatedly referred to treatment with a provider, and the ALJ failed to consider records from that provider, plaintiff established that the missing records were significant to establishing her claim of impairment).  The records of Dr. Cianciolo, Dr. Gross, and the MRI radiology report[4] "are important as they may shed light on [Plaintiff's severe impairments] in a way in which the records before the ALJ cannot."  *Id.* at *13.  This is particularly the case in this instance where the ALJ discounted Plaintiff's credibility as to the disabling effects of his ailments.

Dr. Katz, in his notes assigning Plaintiff's back and finger permanent partial disability, wrote above this assessment "See letter."  (R. 283).  This omitted letter is also significant.  The ALJ discounted Dr. Katz's opinion relating to permanent partial disability on the ground that "there is virtually no treatment or objective findings to support even a five percent disability rating."  (R. 16).  Yet, the treatment notes strongly suggest Dr. Katz had authored a letter wherein he explains the disability finding.  This letter may explain the clinical bases for the disability rating, and thus provide the "treatment or objective findings" that the ALJ sought.  Again, this omitted record is important because it may shed light on Plaintiff's impairments in a

---

[4] The Commissioner claims that the actual MRI report is not necessary because its findings were summarized by Dr. Umashanker.  Dr. Umashanker, who is not a radiologist, is the only physician interpreting the report in the record. Having the actual report, prepared by a radiologist, would perhaps have provided relevant information that a summary (in difficult to decipher handwriting) did not.

14

way in which the records that were considered by the ALJ did not.  *See Parker*, 2015 WL 928299, at *13.

The ALJ is obligated to develop the record "if there is reasonable basis to believe that relevant medical evidence might be available."  *Spain v. Barnhart*, No. 02-cv-4605(FB), 2003 WL 21254782, at *4 (E.D.N.Y. May 29, 2003).  Here, there is a reasonable basis to believe that additional medical evidence is available that would be germane to the ALJ's RFC analysis and his assessment of Plaintiff's credibility.  Accordingly, the Court finds that, in this instance, the ALJ failed to properly develop the record by not obtaining treatment records from Dr. Gross and Dr. Cianceiolo, and by not obtaining the MRI report and the Dr. Katz letter.[5]  *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (citation omitted) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel[…]'"); *see also Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 346 (E.D.N.Y. 2010)(citation omitted) ("Where, [] it is apparent from the face of the record that the record lacks necessary information, the ALJ cannot be relieved of his affirmative obligation to develop the record by a statement of counsel.").  The Court further notes that "[b]y failing to adequately develop the record before evaluating Plaintiff's impairments, the ALJ failed to properly assess Plaintiff's credibility." *Khan v. Astrue*, No. 11-cv-5118 (MKB), 2013 WL 3938242, at *21 (E.D.N.Y. July 30, 2013) (compiling cases). Under these circumstances, the ALJ's failure to obtain these records is legal error.

---

[5] Plaintiff has failed to demonstrate that any of the missing records from the Cornell Scott Hill Health Center are significant. Plaintiff only claims that this treatment provider recommended physical therapy.  This is insufficient to show how he was harmed by the absence of these records.  As such, the Court will not order remand as to the Cornell Scott Hill Health Center treatment notes.

The Court's finding in this case will not open up remand to any plaintiff who merely speculates that additional evidence exists that is relevant to his claim.  As explained above, (1) on this record, there were numerous instances where additional relevant, and likely important, records were specifically referenced in the records that were before the ALJ, meaning that there were obvious gaps in the record of which the ALJ was aware; and (2) Plaintiff has demonstrated that the missing records were significant: he was prejudiced by the ALJ's determination because the omitted records would affect the ALJ's evaluation of Plaintiff's RFC and credibility.  *See Pniewski v. Astrue*, No. 3:12-cv-01809 (WWE), 2014 WL 2815700 (D. Conn. June 23, 2014).

**b.  Plaintiff's Remaining Arguments**

Because the Court finds the need to further develop the record, it need not address Plaintiff's remaining claims.

## Conclusion

For the reasons set forth above, the Court recommends that Plaintiff's motion to reverse the decision of the Commissioner and/or remand [Doc. #16] be GRANTED in part, and Defendant's motion to affirm the decision of the Commissioner [Doc. # 19] be DENIED.   The matter should be remanded to the ALJ for further proceedings in accordance with this opinion.

This is a Recommended Ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this Recommended Ruling must be filed within 14 days after service.  *See* Fed. R. Civ. P. 72(b)(2). In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part.  *See* Fed. R. Civ. P. 72(b)(3) and D. Conn. Local  Rule 72.1(C)(1) for Magistrate Judges.

The Clerk's Office is further instructed that, if any party appeals to this Court the decision made after remand, any subsequent Social Security appeal is to be assigned to the Magistrate Judge who issued the Recommended Ruling in this case, and then to the District Judge who issued the Ruling that remanded the case.

SO ORDERED, this __20th__ day of July, 2015, at Bridgeport, Connecticut.

_____/s/ William I. Garfinkel_____
WILLIAM I. GARFINKEL
United States Magistrate Judge